IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                     Cr. No. 16-2686 JCH

MARK WILLIAM ELLIOTT,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Mark William Elliott's *Motion for Suppression of Evidence* [Doc. 33]. As grounds for the motion, Elliott argues that he was unconstitutionally searched and seized without a warrant by Albuquerque police, and that the evidence obtained as a result should be suppressed as "fruit of the poisonous tree." On September 5, 2017, the Court conducted an evidentiary hearing on the motion, at which Elliott was present. After considering the briefs, the evidence, and the oral arguments of counsel, the Court concludes that the motion to suppress should be denied. The initial encounter, including the officers' questions to the Defendant, was justified under the community caretaker exception to the Fourth Amendment. However, that initial encounter quickly gave way to a pat-down search that was justified for officer safety under the Supreme Court's opinion in *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Defendant's attempt to conceal from the officers the fact that he had a gun and his subsequent attempt to flee the pat-down justified his arrest. The drug evidence found in Defendant's jacket was properly discovered in a search pursuant to that arrest.

# FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 2016, a 911 caller who identified herself as "Donna" alerted police to an unresponsive adult male lying on the sidewalk beside a red motorcycle near the intersection of Hermosa Drive NE and Candelaria Rd. NE in Albuquerque, New Mexico. *See* Exhibit 1 (recording of call) and Exhibit 2 (transcript of call). Donna said that she did not think the man was breathing, but that she did not want to get too close. *Id*. The Albuquerque Police Department ("APD") dispatched officers to the scene.

Three APD officers—Sabrina Lopez, Jon Oguin, and Robert Sanchez—arrived at the scene and saw the motorcycle parked at the side of the road in close proximity to a stop sign, with Elliott lying on his back on the sidewalk next to the motorcycle with his eyes closed. Transcript of hearing at 12, 15-17, 47-49, 64-65. There were keys lying on the sidewalk near Elliott. *Id*. at 18. Sanchez moved the keys away from Elliott. *Id*. at 18-19. Then, Sanchez tugged on Elliott's jacket, *id*. at 19; he awoke immediately and quickly stood up. *Id*. The officers asked Elliott several times if he was alright, but he did not respond at first. *Id*. at 20-21; Exhibit 1. Eventually, Elliott said that he was tired. Exhibit 1. Sanchez asked, "What are you tired for?" Exhibit 1. Again, Elliott gave no audible response. *Id*. At the hearing, all three officers testified that Elliott was verbally non-compliant by refusing to answer their questions, and that he displayed unusual and nervous behavior by glancing around quickly, as though scanning for a route of escape. Transcript at 20-21, 52-53, 70-71. He also rubbed his hands on his pockets and repeatedly picked his foot up and put it down. *Id*. at 56, 70. One of the officers asked for Elliott's identification, which he obtained by twisting his body and using his left hand to cover his right front pants pocket and his right hand to reach into his right rear pants pocket to get the identification card. Exhibit 1; Transcript at 24-25, 71. This behavior was unusual and caused

Lopez to be suspicious that Elliott might have a weapon in that front pocket. Transcript at 71. Elliott handed his identification to Lopez. *Id*. at 32, 72. Observing a bulge in Elliott's right front pants pocket that she believed might be a weapon, Lopez alerted Oguin and then told Sanchez to pat down Elliott for weapons. *Id*. at 22, 50-51, 71-72.

Sanchez directed Elliott to turn around and put his hands behind his head. Exhibit 1 and Transcript at 26. Elliott complied. During the pat down, Sanchez asked Elliott if he had anything that would "poke or prick" him, to which Elliott responded that he had needles in his pocket. Exhibit 1; Transcript at 23. Sanchez asked Elliott if the needles were capped. *Id*. Elliott did not answer this but instead offered to get them out for Sanchez, who warned Elliott not to reach into his pockets. Exhibit 1; Transcript at 27, 75. Sanchez asked which way the needles were pointing, but Elliott ignored the question. Exhibit 1. Sanchez asked Elliott if he could remove Elliott's jacket so that Sanchez could see what he was doing; Elliott did not object verbally and appears to have complied in removing the jacket. Exhibit 1; Transcript at 25, 73. Next, Sanchez patted Elliott's right front pants pocket and felt a hard object there. Transcript at 24. He opened the top of Elliott's pocket and saw the handle of the firearm; when Sanchez attempted to remove the gun, Elliott turned and attempted to break free, turning and running away from Sanchez. Transcript at 26. However, Elliott ran straight into Oguin. *Id*. at 54. Sanchez exclaimed, "He has a gun, he has a gun!" *Id*. at 54; Exhibit 1. Oguin grabbed Elliott and prevented him from fleeing. Transcript at 54. Sanchez held Elliott's right hand to prevent him from grabbing the gun. The officers cuffed Elliott behind his back. According to testimony by Sanchez and Lopez, Elliott resisted their efforts to place him in handcuffs. Transcript at 26-27, 76.

The officers searched Elliott and his jacket further and found a white powdery substance and drug paraphernalia. A field test of the substance was a presumptive positive for methamphetamine.

Elliott asserts that his seizure and subsequent search were unconstitutional, and that therefore the gun and drug evidence found as a result must be suppressed. In response, the Government argues that (1) it did not require a warrant to detain and search Elliott because of the community caretaker exception, (2) the pat down was proper under *Terry v. Ohio*, (3) the evidence would have been inevitably discovered, and (4) the detention and search were permissible under the good faith exception.

## EVIDENTIARY BURDEN

"Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." *United States v. Gama-Bastidas*, 142 F.3d 1233, 1238 (10th Cir. 1998). The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has 'the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the search.' " *Gama-Bastidas*, 142 F.3d at 1238 (quoting *United States v. Skowronski*, 827 F.2d 1414, 1417 (10th Cir. 1987)). Defendant's burden to show a violation of his constitutional rights is distinct from the government's burden regarding admissibility of evidence it seeks to introduce: "[U]pon a motion to suppress, the 'burden of showing admissibility rests, of course, on the prosecution.'" *United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)).

# DISCUSSION

## I. Community Caretaker Exception

The Government argues that the initial encounter between Elliott and the three APD officers was justified by the community caretaker exception to the Fourth Amendment. The Court agrees.

A warrantless arrest may be justified if the arresting officer was acting in a "community caretaking" role. This doctrine allows law enforcement officers to "effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007) (quoting *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)). "We have recognized that, in fulfilling their duties, police officers may exercise functions—'community caretaking functions'—wholly separate and apart from detecting, investigating, or acquiring evidence of a crime." *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). These functions may include, for example, restraining an intoxicated individual, *see Novitsky v. City of Aurora*, 491 F.3d 1244, 1253–54 (10th Cir. 2007); impounding a vehicle left on the side of the road, *see United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir. 1998); or transporting an individual to safety, *see United States v. Madrid*, 30 F.3d 1269, 1277 (10th Cir. 1994). A detention under the community-caretaking exception:

> must be based upon specific and articulable facts which reasonably warrant an intrusion into the individual's liberty. Additionally, the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference. Finally, the detention must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification.

*United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005) (citation, alterations, and quotation marks omitted).

Here, the officers had received information that a man was lying on the sidewalk near a busy intersection, with a motorcycle parked nearby. The 911 caller who reported seeing this man stated that she did not think that he was breathing. These facts, along with the fact that it is virtually unheard of that someone who is in good health and sound mind would lie down on a sidewalk for a nap, are sufficient articulable facts justifying the need to briefly detain Elliott in order to assure his safety and the safety of the public. Thus, Sanchez was justified in moving Elliott's motorcycle keys out of his reach until the officers could be sure that Elliott was not intoxicated. Further, the officers were justified in their brief questioning of Elliott about his condition, and the reasons he was sleeping on the sidewalk. After he was awakened by Sanchez, Elliott jumped to his feet but appeared incoherent. He appeared nervous, glancing around as though searching for something, and he ignored many of the officers' questions about his condition and how he came to be lying on the sidewalk. Although Elliott complied physically with their requests, he said almost nothing that would assure a reasonable officer that he was able to drive safely or that he would not go back to sleep on the sidewalk (where he would be vulnerable to theft or to an attack) if they were to leave. Thus, the initial encounter was justified under the community caretaker doctrine. However, the officers' brief detention of Elliott under the community caretaker exception quickly turned into a reasonable pat-down justified under *Terry v. Ohio*, as explained below.

## II. Pat Down Under *Terry v. Ohio* and Subsequent Inventory Search

The Fourth Amendment governs pat-down searches of an individual for weapons, and as a result the pat-down is constitutionally valid only if it is reasonable. U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 19 (1968). A reasonable pat-down occurs when an officer has "reasonable suspicion that a person is armed and dangerous." *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007); *see also Terry*, 392 U.S. at 27. The justification for this requirement is primarily grounded in concerns for officer safety and the safety of bystanders:

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Terry*, 392 U.S. at 27; *see also United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014).

Given this understandable concern for officer safety, the Tenth Circuit has upheld pat-down searches "[e]ven when an officer had limited 'specific information leading him to believe that [an individual] was armed or dangerous' and no knowledge of the individual's having possessed a weapon." *Garcia*, 751 F.3d at 1142 (second alteration in original) (quoting *McRae*, 81 F.3d at 1536). In *United States v. McRae*, for instance,

> an officer frisked Mr. McRae after obtaining consent to search Mr. McRae's vehicle. Th[is] court concluded the officer had reasonable suspicion to frisk Mr. McRae because (1) "a search of the car might compel [the officer] to turn his back on Mr. McRae, and the two men were on an isolated stretch of highway"; (2) the officer received information that Mr. McRae ha[d] a criminal history and should be approached with "extreme caution"; and (3) Mr. McRae put on his jacket before exiting his vehicle, and "a jacket is a likely place in which to store a weapon."

7

*Id*. at 1146 (citations omitted) (quoting *McRae*, 81 F.3d at 1531-32, 1536). And in *United States v. Manjarrez*,

> an officer frisked Mr. Manjarrez after obtaining consent to search Mr. Manjarrez's vehicle. Unlike the officer in *McRae*, however, the officer in Manjarrez had no knowledge of any previous criminal history, and Mr. Manjarrez was not acting suspiciously. Th[is] court concluded that the officer "could not reasonably be expected to leave Defendant in his patrol car, turn his back on Defendant, insert his head into Defendant's car, and search the car without first checking Defendant for weapons."

*Id*. (citations omitted) (quoting *Manjarrez*, 348 F.3d at 884, 887). These two cases taken together have led the Tenth Circuit to conclude that when an officer must "turn his or her back to a defendant, we require[ ] little beyond this concern to support the officer's reasonable suspicion." *Id*. at 1147.

Nonetheless, the Tenth Circuit reaffirmed in *United States v. Garcia*, 751 F.3d 1139 (10th Cir. 2014), that a reasonable suspicion analysis is still first and foremost a multi-factor test based on the totality of the circumstances. *Id*. at 1144-46; *see also Rice*, 483 F.3d at 1083. In addition to the officer having to turn his or her back on the defendant, other factors that can influence an officer's reasonable suspicion include (but are not limited to) the time of day when and the place where the pat-down occurred, any previous encounters the officer had with the defendant, the defendant's criminal history, the defendant's nervousness, and the defendant's history of drug use. *Garcia*, 751 F.3d at 1144-47. Moreover, when a defendant is in a "relatively small automobile" with a passenger who has outstanding arrest warrants and "either individual could access weapons inside the passenger compartment," we have held that an officer may "infer a common purpose or 'enterprise' between the two men and believe that [the defendant] knew of [the passenger's] arrest warrants and would want to conceal evidence of any wrongdoing." *United States v. Dennison*, 410 F.3d 1203, 1213 (10th Cir. 2005) (quoting

*Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)). This "common purpose or enterprise" also bears on the reasonable suspicion analysis. *See id*.

In the end, when finally weighing the totality of the circumstances, the Court must be careful to "tak[e] into account an officer's reasonable inferences based on training, experience, and common sense," *Rice*, 483 F.3d at 1083 (emphasis added), and to that extent "we look at the objective facts, not the officer's state of mind" when "measuring the actions of a police officer under the Fourth Amendment," *United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002). In the end, reasonable suspicion must meet only a "minimum level of objective justification." *Garcia*, 751 F.3d at 1143 (quoting *Rice*, 483 F.3d at 1083) (internal quotation marks omitted). This level "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Here, the officers testified, and the belt video of the encounter supports, that during the initial encounter Elliott was acting nervously and was uncommunicative with the officers. After observing a bulge in Elliott's right front pants pocket, as well as the strange manner in which Elliott twisted his body to cover the bulge while he got his identification out of his pocket, Lopez instructed Sanchez to pat Elliott down for weapons. The totality of the circumstances justified this decision. Lopez's observation of an unusual bulge in Elliott's pocket, along with Elliott's own behavior both before and during the encounter, constitutes specific information leading her to believe that Elliott may have been armed or dangerous. Thus, this portion of the encounter did not violate Elliott's constitutional rights.

As described above, the pat-down led to the discovery of a firearm in Elliott's right front pants pocket. The moment that Sanchez observed the gun, the *Terry* pat-down ended as Elliott

made an attempt to evade the officers with his gun still on his person and in his possession. Once the officers were able to regain control of Elliott, they had probable cause to arrest him for the crime of evading the police. Transcript at 36. At that point, the officers were justified in performing an inventory search of Elliott's motorcycle and jacket, as part of that arrest. The police could hardly be expected to abandon the jacket or motorcycle on the street where they stood; rather, the police had a duty to impound and search them. As the Tenth Circuit has noted, a lawful inventory search promotes three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). After arresting Elliott, the officers had the right to search the jacket that Elliott had been wearing in order to protect themselves from potential danger, as well as to protect his property while it was in their custody. Thus, the search of the jacket that led to the discovery of the methamphetamine was lawful.

For the foregoing reasons, the Court concludes that the police did not violate Elliott's Fourth Amendment rights when they detained and searched him and his clothing.

**IT IS THEREFORE ORDERED** that the *Motion for Suppression of Evidence* [Doc. 33] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**